**EDELSBERG LAW, P.A.**
Scott Edelsberg (SBN 330990)
1925 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (305) 975-3320
scott@edelsberglaw.com

*Attorneys for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SANDER KONING, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| UNDERDOG SPORTS, LLC d/b/a UNDERDOG FANTASY, | ) ) ) |
| Defendant. | ) ) ) |

Case No.

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Sander Koning ("Plaintiff"), individually and on behalf of all others similarly situated, hereby alleges the following against Defendant Underdog Sports, LLC d/b/a Underdog Fantasy ("Defendant" or "Underdog"), based upon, *inter alia*, the investigation made by his counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiff which are based upon his personal knowledge.

### NATURE OF THE CASE

1. This case arises out of Defendant's operation of an illegal sports betting platform masquerading as Daily Fantasy Sports ("DFS") contests.

2. Defendant owns and operates one of the most popular and profitable online and app-based fantasy-sports platform , Underdog, available at https://www.underdogfantasycom.

3. Underdog, for years, has falsely represented to consumers and the public that its daily fantasy sports contests is legal and legitimate in California. But in reality, Defendant owns and

operates an unlicensed sports betting platform. By operating unlicensed sports betting, Defendant has violated California laws, engaged in illegal deceptive active, and unjustly enriched itself to the tune of millions of dollars.

4. Daily fantasy sports platforms entice consumers to choose fantasy teams of real-world athletes and pit those teams against teams created by other participants. The outcome—who "wins" and who "loses"—is dictated not by chance, but by the actual, real-world performance of the athletes on the fantasy teams.

5. Underdog allows users to access "games" that are not "fantasy." But these are not fantasy games. Instead, these games are plainly illegal online sports bets. For example, Defendant's platform allows consumers to wager on how individual real-world athletes will perform against performance benchmarks unilaterally set by Defendant. Consumers are not competing against one another, but in reality, they are betting against the house—Underdog—who sets sophisticated betting lines designed to ensure its own profit. Nor is it "fantasy," because consumers are not betting on imaginary teams of athletes, but simply betting on the performance of real-world athletes.

6. Thus, in truth, the "fantasy sports" contests are, undoubtedly, online sports betting.

7. To deceive consumers, Underdog has branded itself as a "fantasy sports" platform, which is simply a title to mislead regulators and consumers into believing it offers harmless gameplay instead of unlawful sports betting.

8. Underdog players deposit money, stake entry fees, and win or lose depending entirely on the uncertain performance of third-party athletes in real-world professional and collegiate sporting events.

9. California law flatly prohibits sports betting. Penal Code § 337a makes it illegal to "lay, make, offer or accept any bet or wager upon the result" of any contest of skill, speed, or endurance of persons or animals. The California Attorney General recently confirmed that DFS contests, including Pick'em and Draft Style formats, fall squarely within this prohibition and constitute unlawful gambling.

10. Underdog profits by offering these unlawful contests to California consumers. It collects entry fees, retains a guaranteed rake from every contest, and structures payouts so that the overwhelming majority of players lose money. By operating and profiting from illegal gambling,

Underdog violates California's Unfair Competition Law, Consumers Legal Remedies Act, and multiple state and federal gambling statutes.

11.     Underdog compounds the illegality by deceptively marketing its contests as "fantasy sports" and "games of skill," while concealing their true nature as proposition and parlay wagers. Reasonable consumers are misled into believing they are participating in lawful fantasy sports contests when in fact they are placing unlawful sports bets against the house.

12.     Online sports betting is highly addictive and strictly regulated in California. By law, except for limited carveouts not applicable here, California outright bans sports wagering. Defendant's operations flout these legal requirements by masquerading as a "Daily Fantasy Sports" platform.

13.     Plaintiff, individually and on behalf of all other similarly situated, brings this action to stop Underdog from unlawfully operating sports-betting contests in California, to secure restitution and damages for consumers who paid entry fees into these illegal games, and to obtain injunctive relief preventing Underdog from continuing to profit from unlawful gambling.

**PARTIES**

14.     At all times material hereto, Plaintiff has been a resident of Monterey County, California.

15.     Defendant is a company headquartered in New York and with its principal places of business in North Hollywood, California. Underdog Sports, LLC d/b/a Underdog Fantasy owns and operates an  illegal sports betting platform and app under the brand "Underdog." Underdog Sports LLC conducts business within the venue of this District and throughout California generally.

**JURISDICTION AND VENUE**

16.     This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §1332(d), this Court has subject matter jurisdiction because (1) the amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00, (2) the proposed Class is comprised of at least 100 members, and (3) complete diversity exists between at least one plaintiff or class member and one defendant.

17.     This Court has personal jurisdiction over Defendant because it regularly conducts business and activities in this District, including activities that form the basis for the claims here, and

a substantial part of the acts and omissions complained of occurred in this District. Moreover, Plaintiff resides in this District.

18.     Venue is proper in this District under 28 U.S.C. §1391 because Plaintiff resides in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District, including Underdog's unlawful actions.

## FACTUAL BACKGROUND AND COMMON ALLEGATIONS

### I.     The Problem of Online Sports Betting

19.     Gambling addiction in the United States has escalated into a significant public health crisis, fueled by the rapid expansion of online casinos and sports betting platforms, including so called "social casinos."

20.     Since the Supreme Court's 2018 decision to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from $4.9 billion in 2017 to $121.1 billion in 2023.[1] This proliferation has been accompanied by a dramatic rise in gambling addiction cases.[2]

21.     Approximately 2.5 million adults in the U.S. suffer from severe gambling problems, while an additional five to eight million experiencing significant issues.[3] Alarmingly, individuals with gambling disorders are 15 times more likely to commit suicide than the general population.[4]

22.     Between 2018 and 2021, the Nation Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between

---

[1]   https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_ (last accessed July 29, 2025).
[2] *See id.*
[3]      https://news.harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-now/#:~:text=The%20National%20Council%20on%20Problem%20Gambling%20estimates%20that%20about%202.5,of%20callers%20is%20skewing%20younger. (last accessed July 29, 2025).
[4]https://www.who.int/news-room/fact-sheets/detail/gambling#:~:text=A%20Swedish%20study%20estimated%20that,the%20general%20population%20(4) (last accessed July 29, 2025).

CLASS ACTION COMPLAINT

2021 and 2022.[5]

23.    Further, internet searches for help with gambling addiction, such as "am I addicted to gambling", have cumulatively increased 23% nationally since *Murphy v. NCAA* through June 2024. This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-seeking nationally, with 180,000 monthly searches at its peak.[6]

24.    The surge in gambling addiction is particularly pronounced among young men, with 10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general population.[7] Online sports betting platforms have been identified as significant contributors to this trend. These platforms often employ addictive design features, such as count-down timers to pressure users into placing hasty bets.

25.    The addiction and fallout related thereto is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers. Moreover, despite the growing prevalence of gambling addiction, funding for treatment remains insufficient.

26.    In California, it is illegal wager on sports. *See generally* Cal. Penal Code §§ 330 *et. seq.* In this regard, California has a long history of regulating attempts to win money based on the outcome of sporting events.

## II.    *California Law Flatly Prohibits Sports Wagering.*

27.    California has long prohibited sports wagering as a matter of statute and deep-rooted public policy.

28.    Since statehood, California has strictly regulated and prohibited gambling activities that involve staking money on uncertain events. Article IV, § 19 of the California Constitution bans lotteries, directs the Legislature to prohibit "casinos of the type currently operating in Nevada and

---

[5] https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/ (last accessed July 29, 2025).

[6]    https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_  (last accessed July 29, 2025).

[7] https://apnews.com/article/sports-betting-compulsive-gambling-addiction-d4d0b7a8465e5be0b451b115cab0fb15 (last accessed July 29, 2025).

New Jersey," and requires statutory safeguards against unauthorized forms of gambling.

29.    Consistent with these constitutional commands, Penal Code § 337a, which prohibits wagering on sports, makes it unlawful to "lay[], make[], offer[] or accept[] any bet or bets, or wager or wagers, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus."

30.    California courts consistently construe this prohibition broadly. In *Western Telcon, Inc. v. California State Lottery*, 13 Cal. 4th 475, 485 (1996), the California Supreme Court explained that a "bet" or "wager" means a "promise to give money or money's worth upon the determination of an uncertain or unascertained event in a particular way." The Supreme Court emphasized that betting remains need not be a game of chance and remains unlawful even if it involves skill or judgment rather than pure chance.

31.    California has carved out limited statutory exceptions—none of which are applicable here—but otherwise bans all forms of sports betting.

### III.    Daily Fantasy Sports are Illegal Sports Wagers

32.    On July 3, 2025, California Attorney General Rob Bonta issued a published opinion (No. 23-1001), holding that daily fantasy sports ("DFS") contests—specifically, "pick'em" and "draft-style" contests—are illegal sports betting in violation of Penal Code § 337a.

33.    Attorney General Bonta expressly held that California law "prohibits the operation of daily fantasy sports games with players physically located within California, regardless of where the operators and associated technology are located." As explained in the Opinion, players pay money to participate in contests where they win or lose based entirely on the real-world performance of athletes in sporting events. Because the "success" of the DFS player depends on those uncertain, external athletic events, the entry fees constitute unlawful wagers within the plain meaning of § 337a.

34.    California is no outlier. Attorney General Bonta's conclusion is consistent with the uniform view of regulators nationwide. Attorneys General in Mississippi, Texas, Georgia, West Virginia, and Nevada, as well as gaming commissions in Arizona, Virginia, Wyoming, and Florida, have unanimously recognized DFS contests as a form of sports betting when offered under general gambling prohibitions.

35.     To date, no regulator has concluded otherwise absent express statutory carve-outs . In California, no such carve-out exists.

### IV.    *"Pick'Em" Contests Are Nothing More Than Proposition Bets*

36.     In "pick'em" contests, players wager on the performance of specific athletes on specified statistical metrics. For example, a player may be asked to predict whether Steph Curry will score more than 20 points, or whether Jimmy Butler will collect more than 7 rebounds, in a given game.

37.     The Attorney General concluded that pick'em contests violate Penal Code § 337a because entry fees are bilateral wagers between the consumer and the operator: the operator sets thresholds, the consumer pays money to predict whether the outcome will be above or below the line, and both sides have a direct financial stake in the outcome of the game. And the real-world sporting events clearly constitute contests of skill.

38.     Pick'em contests are materially indistinguishable from proposition or parlay bets offered by traditional sportsbooks. Regulators in Virginia, Arizona, and Florida have explicitly categorized pick'em as "proposition betting," one of the most common and recognition forms of sports wagering.[8]

39.     It is irrelevant whether DFS operations, like Underdog, argue that skill over chance predominates in making predictions. California law does not require chance to predominate for an activity to constitute betting or wagering. *Western Telcon*, 13 Cal. 4th at 485. As the Attorney General noted, even highly skilled horse-race betting falls within the reach of § 337a.

40.     Operators also cannot avoid liability by claiming that pick'em contests involve outcomes other than the final score of the game, such as an athlete's point total or rebounds collecting. The "result" of a sporting contest under § 337a includes any consequential athletic outcome, such as an individual's point total, rebound total, or completion percentage. Proposition betting on these "results" is squarely within the statute.

---

[8] *See, e.g.*, 2023 Ops.Va.Atty.Gen. 133 (Dec. 12, 2023); Wyoming Gaming Commission, letter to PrizePicks, July 5, 2023; Florida Gaming Control Commission, letter to Betr, Sept. 19, 2023.

***V.       "Draft-Style" Contests Are Also Unlawful Bets on Third-Party Performances***

41.     In "draft-style" contests, players pay entry fees to build rosters of professional athletes subject to salary-cap or other rules. Each roster or team accumulates points based on the athletes' performance in real-world games, and prizes are awarded to the highest-scoring teams. Thus, "winners" are not determined by chance, but rather by the real-world statistics in a single game. As with pick'em games, whether a player wins or loses money depends on the outcome of the underlying sports game.

42.     Because DFS players do not themselves compete in the underlying sporting event, their entry fees are indistinguishable from wagers on the performance of others. Hence why, Attorney General Bonta confirmed that draft-style DFS contests also fall squarely within under Penal Code § 337a.

43.     California courts have long distinguished between (a) paying an entry fee to *participate* in a contest (e.g., a golf tournament or spelling bee), and (b) *wagering* on the outcome of contests played by others. *Ex parte McDonald* (1927) 86 Cal.App. 362, 363-366. DFS players fall into the latter, illegal category—they are not competing on the field of play but are instead betting on athletes who do. A players' financial gain or loss will be determined by the results of a sports game played by others.

44.     This Court agrees. In *Los Angeles Turf Club v. Horse Racing Labs, LLC*, No. CV 15-09332, 2017 WL 11634526 (C.D. Cal. May 15, 2017), this Court held that entry fees in a fantasy horse-racing contest were "wagers" as to the outcome of a horserace. The court analogized DFS entry fees to the "pot" in poker—funded by entry fees and distributed to winners—finding the contest indistinguishable from gambling despite some level of skill involved. *Id*. at *9.

45.     Similarly, the IRS Office of Chief Counsel likewise concluded in Memorandum No. AM 2020-009 (July 23, 2020), that that DFS entry fees are "wagers" subject to the federal wagering excise tax.

46.     Every state Attorney General or regulator that has analyzed DFS draft-style contests under a general sports-betting prohibition has reached the same conclusion: it is illegal gambling (i.e., wagers on the uncertain performance of others), not a lawful contest, and fall within the scope of gambling prohibitions.

***VI.      Daily Fantasy Sports Inflicts the Same Social Harms That Led California to Ban Sports Betting***

47.      In 1909, California enacted Penal Code § 337a amid widespread concern about the "ruinous effect" of racetrack betting, which legislators likened to an "infectious disease, easily caught and exceedingly hard to shake off," that destroyed families and drove individuals to financial ruin.

48.      The Legislature's intent was to curb addiction, financial ruin, and related harms. Contemporary accounts emphasized that gambling losses often led individuals to "steal[] from their employers in order to gamble at the races" and to chase losses with ever-increasing stakes.

49.      The same dangers are inherent in DFS contests. Operators allow consumers to enter hundreds of lineups per contest, charge entry fees ranging from a few dollars to thousands, and design payout structures that ensure operator profit while causing the vast majority of players to lose.

50.      DFS is uniquely dangerous because it combines the addictive qualities of in-game sports betting with the accessibility and immediacy of mobile app platforms. As the Attorney General emphasized, DFS contests encourage precisely the same loss-chasing behavior that § 337a was enacted to prevent. The rapid-fire pace of contests, coupled with ease of mobile accessibility, exacerbates the risk of addiction and financial harm.

51.      DFS contests, like Underdog, therefore inflicts the same social and financial harms that motivated California to prohibit sports betting more than a century ago, and it violates the same statutory protections today.

***VII.     Daily Fantasy Sports Are Merely a Digital Reincarnation of Illegal Sports Betting***

52.      The mechanics of DFS mirror those of traditional sports wagering that California law has long prohibited. Like traditional sportsbooks, DFS operators induce consumers to stake money on the uncertain performance of real-world athletes in real-world sporting events.

53.      DFS "pick'em" contests replicate typical proposition bets, requiring consumers to predict whether individual athletes will exceed or fall below a statistical line set by the operator. This s no different from a sportsbook bet on whether a player will score a certain number of points or rebounds in a given game.

54.      DFS "draft-style" contests replicate parlay wagering, in which bettors make multiple predictions simultaneously. Players assemble rosters of athletes whose combined performance

determines the outcome—functionally the same as a parlay bet spanning multiple sporting events.

55.    In both formats, players pay entry fees that constitute wagers because they are promises to give money depending on the outcome of uncertain future sporting events. Just as in traditional sports betting, players do not control or influence the athletic contests; they merely bet on them.

56.    The Attorney General confirmed that DFS contests are "materially indistinguishable" from traditional sports wagering, concluding that both involve staking money on the results of sports competitions in violation of Penal Code § 337a.

57.    Thus, DFS contests, like Underdog's, constitute nothing more than unlawful sports betting disguised as fantasy games. Indeed, it is simply the latest iteration of sports betting—delivered and gamified through addictive mobile apps instead of racetracks or betting parlors—that California law has long outlawed to shield consumers from the well-documented, historical dangers of gambling.

58.    By operating these contests in California, Defendant engages in conduct expressly prohibited by Penal Code § 337a.

### VIII.    Underdog uses "Daily Fantasy Sports" contests to Disguise Illegal Sports Betting.

59.    Defendant Underdog operates a website and mobile application available in California that offers consumers the ability to deposit real money, enter paid contests, and win cash prizes based on the real-world performance of professional athletes.

60.    Underdog advertises itself as a "fantasy sports" platform to avoid gambling regulations and trick potential players into believing that it offers legal contests. But this is false. In reality, Underdog's contests are structures as sports wagers prohibited by California law. Players risk money on uncertain athletic outcomes, and Underdog, as the operator, profits by retaining a portion of the entry fees paid by consumers.

61.    Players can access Underdog either through the internet website or on Apple and Android devices in the United States through the App Store and Play Store, respectively.

62.    Until very recently, Underdog offered California players two primary DFS contest

CLASS ACTION COMPLAINT

1  formats: "Pick'em" and "Drafts."[9]

2            *a.  Underdog's "Pick'em" Contests*

3         63.     In Underdog's "Pick'em" contests, no longer offered to California players but were

4  available during the majority of the class period, users are prompted to select between two and five

5  professional athletes across upcoming games. For each athlete, Underdog sets a statistical threshold

6  — for example, whether Steph Curry will score "over or under 28.5 points" or whether Patrick

7  Mahomes will record "over or under 85.5 rushing yards."

8         64.     After making their selections, users place an entry fee of their choosing. The amount

9  wagered dictates the size of the potential payout, which increases with the number of predictions

10  bundled together. For example, a $20 entry predicting two outcomes may return $60 if both are

11  correct, while a five-pick entry may pay out 20 times the entry fee if every prediction hits.

12         65.     The structure of these contests mirrors proposition betting offered by sportsbooks.

13  Players are not competing against one another in a game of skill. Instead, they are betting directly

14  against Underdog, who sets the "lines" for each athlete's statistical performance.

15         66.     The operator has a direct financial interest in the outcome: if a consumer's predictions

16  are wrong, Underdog retains the entry fee; if correct, Underdog pays out winnings based on a pre-set

17  schedule it controls.

18         67.     These mechanics are indistinguishable from traditional sports wagers in that the results

19  of the Pick'em contests are contingent and unknown at the time the bets and wagers are collected and

20  record by Underdog, precisely   why the California Attorney General has specifically identified

21  "Pick'em" contests as prohibited betting under Penal Code § 337a.

22            *a.  Underdog's "Drafts" Contests*

23         68.     Underdog also offers players to participate in their "Drafts" contests. Underdog offers

24  numerous different types of Drafts contests.

25         69.     No matter the type of Drafts, all adhere to the same format: players place bets with

26  Underdog regarding the expected future actual performance of athletes in real-world sporting events.

---

[9] Shortly after the Attorney General's Opinion, Underdog removed the capability of placing pickem bets in California.

Underdog collects the sums wagered by users and pools the bets together into a "prize pool" similar to a "pot" in poker. Underdog tracks all of the bets on its own ledger like a traditional betting book. Then, after the underlying, real-world sporting event occurs, Underdog will pay out the winners based on their records and the outcome of the actual sporting event. Underdog determines the share of the prize pool based on the bets it keeps.

70.     The following image describes "How to Play" a Drafts contest:



71.     As illustrated above, athletes are assigned values based on expected performance. Players must select a complete roster (typically 2-8 players) and decide whether they will go higher or lower than Underdog's projected performance metrics. Once selected, rosters are locked, and consumers cannot make further adjustments. Players then place bets with Underdog regarding the expected future actual performance of the athletes in real-world sporting events. Underdog collects the sums wagered by users and pools the bets together into a "prize pool" similar to a "pot" in poker.

72.     Underdog awards prizes based on the aggregated performance of each roster in real-

world games. Points are awarded for athletic statistics such as touchdowns, rebounds, or runs batted in. The consumer with the highest scoring roster wins the largest prize, with smaller prizes distributed to lower-placing entries. For example, in a $10 Draft-Style contest capped at 1,000 entrants, consumers collectively contribute a $10,000 prize pool; Underdog pays the top finisher a guaranteed prize such as $2,000, and distributes the remaining prize money in diminishing amounts to lower-ranked finishers, while the majority of entrants receive nothing.

73.     Underdog retains a percentage of the pooled entry fees (commonly referred to as the "rake") ensuring that the operator profits regardless of consumer outcomes.

74.     In the below screenshots taken from Underdog's app on August 21, 2025 from within California, the Drafts contest is called "Saturday Strikeout," players are presented the option to participate in a Draft tournament which they will select the MLB players in a series of draft rounds and may advance in the tournament based on the real-life performance of the athletes. Players were required to bet $7 to participate, with 4,020 players in the betting pool.




75.    Although the specific bet and wager amounts, number of players, total pool prize, payouts made, and rake retained by Underdog varies from each contest, they all follow the same basic format: players place bets with Underdog regarding the expected future actual performance of a in real-world sporting events. Underdog collects the sums wagered by users and pools the bets together into a "prize pool" similar to a "pot" in poker. Underdog tracks all of the bets on its own ledger like a traditional betting book. Then, after the underlying, real-world sporting event occurs, Underdog will pay out the winners based on their records and the outcome of the actual sporting event. Underdog determines the share of the prize pool based on the bets it keeps.

76.    These "Drafts" contests are not harmless competitions. Players are not competing in sporting events themselves but are wagering money on the performance of athletes over whom they

have no control. As described above, regulators and courts have consistently recognized such contests as indistinguishable from parlay or horse-race betting.

77.    Underdog markets its "Drafts" contests as games of skill. In reality, however, they are wagers on the uncertain future performance of athletes in professional sporting events, precisely the type of conduct California law prohibits under Penal Code § 337a.

### a.    Underdog Profits from Illegal Sports Betting

78.    Across both contest formats, Underdog's business model depends on consumers staking real money on the uncertain outcomes of professional sporting events.

79.    Underdog profits by setting statistical thresholds, structuring payouts to favor the house, and retaining a percentage of entry fees. The overwhelming majority of participants lose money, while Underdog reaps substantial revenue from illegal sports wagering.

80.    By disguising sports betting as "fantasy sports," Underdog misleads consumers into believing they are participating in lawful contests. In truth, Underdog's mobile app offers nothing more than illegal sports betting in violation of California law.

81.    Underdog also offers players to participate in their "Drafts" contests. In these contests, consumers pay a fixed entry fee to assemble a roster of professional athletes subject to rules such as a salary cap or positional constraints.

### IX.    Underdog Deceptively Markets Illegal Sports Betting as "Fantasy Sports"

82.    Underdog markets its website and mobile app to consumers as a "fantasy sports" platform, creating the false impression that its contests are lawful, skill-based games rather than prohibited sports wagering.

83.    On its website and within the app store descriptions, Underdog repeatedly refers to its contests as "fantasy," "games of skill," and "entertainment," despite the fact that participants stake real money on the uncertain, short-term statistical performance of professional athletes in real-world sporting events.

84.    Underdog's "Pick'em" contests are marketed as causal fantasy games where consumers "choose higher or lower" on player statistics, but the operator fails to disclose that those mechanics are identical to parlay or proposition betting lines offered by traditional sportsbooks.

85.    Similarly, Underdog promotes its "Drafts" contests as skill-driven fantasy drafts, when

in reality consumers' entry fees are pooled and redistributed based on future, uncertain athletic outcomes. Consumers re led to believe they are engaging in lawful fantasy contests, when in fact they are placing sports wagers.

86.    A reasonable consumer, seeing Underdog marketed as a fantasy sports app in the Apple App Store or Google Play Store, would be misled into believing the contests offered are lawful and materially different from traditional sports betting.

87.    In truth, Underdog's contests are sports wagers prohibited by Penal Code § 337a. By misrepresenting and concealing the true nature of its contests, Underdog engages in fraudulent and deceptive conduct that violates the Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq*.

## X.    *All Purported Contracts With Defendant Are Void*

88.    There are two separate and independent reasons why any purported contract with Defendant is void.

89.    First**,** under California law, a contract is not lawful if it is "[c]ontrary to an express provision of law," or "[o]therwise contrary to good morals." Cal. Civ. Code § 1667. Contracts that involve illegal gambling fall squarely within the ambit of this rule. Courts have consistently recognized that agreements formed in connection with unlawful gambling activities are void and unenforceable as a matter of public policy.

90.    Parties cannot lawfully agree to engage in gambling any more than they can lawfully agree by contract to engage in forced labor, sex trafficking, illicit drug sales, or other crimes.

91.    Second, operating a business without a license or registration can result in serious consequences in any state. California has one of the toughest sanctions for conducting business in California without necessary registration or licensing with the Secretary of State.

92.    In addition to costly penalties and fees, California authorizes the automatic voiding of any contracts a company entered into during the period it was out-of-compliance either with the secretary of state or with the California Franchise Tax Board (FTB). Cal. Rev. & T. Code §§ 23304.1.

93.    Specifically, § 23304.1 provides that any contract entered into by a corporation that is not qualified to do business in California, or that is suspended by the FTB, is voidable at the request of any party to the contract other than the noncompliant entity. Thus, any agreements Defendant entered into while unregistered, unlicensed, or suspended under California law are voidable at

1   Plaintiff's election.

2       94.    Accordingly, Plaintiff hereby voids any purported agreement or contract between

3   himself and Defendant. As a result, Defendant may not invoke any contractual defenses—including

4   arbitration clauses, choice-of-law provisions, or class action waivers—because no valid or

5   enforceable agreement exists.

**FACTS SPECIFIC TO PLAINTIFF**

6

7   *Plaintiff Sander Koning Experience*

8       95.    In response to advertisements seen on social media and television, Plaintiff created an

9   account with Underdog on or around late 2023. Plaintiff played Underdog from approximately

10  September 2023 to August 2025 during which he participated in Pick'em and/or Drafts contests.

11      96.    Underdog represented to Plaintiff that the products and services it offered in California

12  were legal. Underdog never disclosed that its "Daily Fantasy Sports" were in actuality illegal sports

13  wagers.

14      97.    In downloading the app and signing up for an account, Plaintiff expressly relied on

    Underdog's representations that the services were legal in California.

15      98.    Plaintiff accessed Underdog and placed all of his wagers in Underdog in California.

16      99.    Plaintiff placed numerous bets on Pick'em and/or Drafts through Underdog's app.

17  Overall, Plaintiff wagered and lost approximately $2,200.00.

18      100.    Underdog never informed Plaintiff of the true nature of its DFS contests were actually

19  illegal sports bets. Had Underdog honestly and accurately disclosed the unlawful nature of its online

20  platform, Plaintiff would have never signed up for Underdog or paid Underdog any money.

21      101.    As a result of Defendant's unfair, unlawful, and deceptive acts, Defendant was unjustly

22  enriched.

23      102.    Plaintiff enjoys playing legal DFS and has an ongoing interest in playing Underdog if

24  it were to change to be devoid of unlawful, deceptive and unfair business practices. Plaintiff therefore

25  has an ongoing interest in Underdog complying with state and federal gambling laws and consumer

26  protection statutes.

**CLASS ALLEGATIONS**

27

28      103.    Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)

on behalf of himself and all others similarly situated defined as follows:

104.    The Class is defined as follows:

> All persons who, during the applicable limitations period, played and lost money wagering on Defendant's online Daily Fantasy Sports platform.

105.    **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identifies are unknown to Plaintiff currently but may be ascertained from Defendant's books and records and other third-party sources.

106.    **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

a.    Whether the DFS contests in Underdog are illegal sports wagering as defined under California law;

b.    Whether Defendant engaged in the conduct alleged in the Complaint;

c.    Whether Defendant violates the statutes listed below in Counts I and II;

d.    Whether Defendant violated statutes analogous to those alleged herein applicable;

e.    Whether and how Defendant manipulates the odds in games offered in Underdog;

f.    Whether Plaintiff and the other Class members were damaged by Defendant's conduct; and

g.    Whether Plaintiff and the other Class members are entitled to restitution or other relief.

107.    **Typicality**. Plaintiff's claims are typical of the claims of the Class because they were players of Underdog who made in-game purchases of coins and wagered such coins as a result of Defendant's unlawful and wrongful conduct. The factual and legal basis of Defendant's liability to Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and

damages due to Defendant's unlawful and wrongful conduct.

108.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

109.    **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the proposed Class to individually seek redress for Defendant's wrongful conduct.

110.    **Final Declaratory or Injunctive Relief.** Defendant has acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

## FIRST CAUSE OF ACTION
**Unlawful & Unfair Business Practices in Violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On behalf of Plaintiff Portugal and the Class)**

111.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–111 by reference as if fully set forth herein.

112.    California's Unfair Competition Law ("UCL") broadly prohibits "any unlawful, unfair or fraudulent business act or practice." Bus. & Prof. Code § 17200.

113.    Plaintiff and Defendant are "persons" within the meaning of the UCL Cal. Bus. & Prof. Code § 17201.

114.    Plaintiff has standing under the UCL because he suffered an injury in fact and lost

money or property as a result of Defendant's unlawful and unfair conduct.

115.    By hosting and facilitating the unlawful online sports betting platform at issue here, Defendant engaged in unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200 by committing unlawful and unfair business acts and practices.

116.    Sports wagering has long been outlawed in California. The DFS contests offered  on Defendant's website, such Pick'em and Drafts, are illegal sports betting.

117.    Defendant engages in unlawful business practices by operating DFS contests in California that are in fact illegal sports wagers prohibited under Penal Code § 337a. Entry fees in Underdog's "Pick'em" and "Draft Style" contests are wagers on the uncertain performance of third-party athletes in real-world contests. The Attorney General of California has concluded that such contests are unlawful gambling under California law.

118.    Defendant further engages in an unfair business practices because its conduct offends established public policy, is immoral and unscrupulous, and causes substantial consumer injury that is not outweighed by any countervailing benefits. California has long prohibited sports wagering due to its addictive nature and destructive impact on families and communities. Defendant exploits consumers by promoting rapid-fire contests, enticing large payouts, and encouraging loss-chasing behaviors, all while ensuring its own profit through retention of entry fees.

119.    Defendant also engages in fraudulent business practices by deceptively marketing its contests as "fantasy sports," "games of skill," and harmless entertainment, while concealing that consumers are wagering against the house on operator-set betting lines. Reasonable consumers are likely to be misled by these representations and omissions.

120.    Defendant's conduct as alleged herein occurred in the course of trade or commerce.

121.    As described herein, Defendant committed unlawful and unfair business acts or practices in violation of the UCL.

122.    As a result of engaging in the conduct alleged in this Complaint, Defendant has also violated the UCL's proscription against engaging in "unlawful" conduct by virtue of its violations of, *inter alia*, the following laws:

       a.   **California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800, *et seq.*):** Sections 19801 and 19850 of the Gambling Control Act provide that

unless licensed, state law prohibits commercially operated gambling facilities; that no new gambling establishment may be opened except upon affirmative vote of the electors; that all gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons who deal, operate, carry on, conduct, maintain or expose for play any gambling game shall apply for and obtain a valid state gambling license. Underdog's "Pick'em and "Drafts" constitute unlawful "gambling games" because they are games "played for currency… or any other thing of value" in which money is staked upon the outcome of uncertain athletic events. Cal. Penal Code § 337j(a)(1). Defendant has not applied for or obtained any state gambling license, and therefore violates California's Gambling Control Act.

b. **California Penal Code § 330a**: Section 330a declares that "[e]very person, who has in his or her possession or under his or her control…or who permits to be placed, maintained, or kept in any room, space, inclosure, or building owned, leased, or occupied by him or her, or under his or her management or control, any slot or card machine, contrivance, appliance or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded, and which is operated, or played, by placing or depositing therein any coins, checks, slugs, balls, or other articles or device, or in any other manner and by means whereof, or as a result of the operation of which any merchandise, money, representative or articles of value, checks, or tokens, redeemable in or exchangeable for money or any other thing of value, is won or lost, or taken from or obtained from the machine, when the result of action or operation of the machine, contrivance, appliance, or mechanical device is dependent upon hazard or chance…is guilty of a misdemeanor." Underdog's app constitutes such a contrivance: consumers deposit money through the app to stake on athletic outcomes set by the operator, and winnings or losses are determined by the operation of Defendant's software.

Defendant's conduct violates Penal Code § 330a.

c. **California Penal Code § 330b**: Section 330b prohibits the manufacture, possession, or operation of "any slot machine or device" that awards money or things of value depending on chance. Underdog's mobile software functions as a prohibited "device" under this statute. The combination of Underdog's app and consumers' mobile devices transforms phones into gambling machines: users "deposit" entry fees, the system calculates outcomes based on uncertain sporting events, and the app pays out money or credits to winning users. Defendant therefore violates Penal Code § 330b.

d. **California Penal Code § 337j(a)(1)**: Defendant violates Cal. Penal Code § 337j(a)(1) by "operat[ing], carry[ing] on, conduct[ing], maintain[ing], or expos[ing] for play" unlicensed gambling in California through its Pick'em and Drafts contents.

e. **California Penal Code § 337j(a)(2)**: Defendant violates Cal. Penal Code § 337j(a)(2) by "receiv[ing], directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game." Underdog profits by retaining a guaranteed rake from every entry fee paid into its contests.

f. **The Illegal Gambling Business Act of 1970 (18 U.S.C. § 1955) (the "IGBA")**: The IGBA declares it a crime to "conduct, finance, manage, supervise, direct, or own all of part" of an illegal gambling business. Defendant violates the IGBA because its business involves five or more persons, has been in continuous operation for more than thirty days, and violates California's gambling laws as alleged herein. By managing, directing, or controlling all or part of the conduct alleged herein Defendant violates 18 U.S.C. § 1955.

g. **The Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367) (the "UIGEA")**: The UIGEA makes it illegal for a "person engaged in the business of betting or wagering" to knowingly accept

payments "in connection with the participation of another person in unlawful Internet gambling." 31 U.S.C. § 5633. "Unlawful Internet gambling" is placing, receiving or transmitting a bet or wager through, at least in part, the Internet where such bet or wager "is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 15 U.S.C. § 5362(10)(a). Underdog knowingly accepts deposits from consumers in California to fund entry fees in its Pick'em and Draft Style contests. Because these wagers are unlawful under California law, they also constitute "unlawful Internet gambling" within the meaning of the UIGEA. By accepting consumer payments in connection with these illegal wagers, Defendant violates federal law.

123. Defendant's conduct described herein is also unlawful and unfair under the UCL because it violates public policy and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers as Defendant offers illegal online sports betting.

124. Through its unfair and deceptive acts and practices, Defendant improperly obtained money from Plaintiff and members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and the members of the Class, and to enjoin them from continuing to violate the UCL. Otherwise, Plaintiff and members of the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. Accordingly, Plaintiff and the Class lack an adequate remedy at law. Moreover, Plaintiff asserts this cause of action in the alternative to its claims for damages below.

125. As a direct and proximate cause of Defendant's deceptive and unfair trade practices, Plaintiff and other members of Class suffered an injury in fact and/or lost money and property as described above.

126. Pursuant to Bus. & Prof. Code § 17203, Plaintiff seeks an injunction on behalf of the general public enjoining Defendant from continuing to engage in the conduct described above as Defendant's wrongful conduct is ongoing.

127. Plaintiff also seeks rescission and an order requiring Defendant to make full restitution and to disgorge its ill-gotten gains wrongfully obtained from members of the California

CLASS ACTION COMPLAINT

1   Class as permitted by Bus. & Prof. Code § 17203.

2       128.    Additionally, Plaintiff and the Class members seek an order requiring Defendant to pay

3   attorneys' fees pursuant to Cal. Civ. Code § 1021.5.

4   **SECOND CAUSE OF ACTION**
**Violation of CLRA, Cal. Civ. Code § 17500, *et seq*.**

5   **(On behalf of Plaintiff Portugal and the Class)**

6       129.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–111 by

7   reference as if fully set forth herein.

8       130.    Plaintiff brings this cause of action on behalf of himself and the Class.

9       131.    Plaintiff and each member of the proposed Class are consumers as defined by Cal. Civ.

10  Code. § 1761(d).

11      132.    Underdog's online platform and mobile app constitutes a "service" within the meaning

12  of by Cal. Civ. Code. § 1761(b).

13      133.    Defendant violated, and continues to violate, the CLRA by, *inter alia*:

14          a.   Marketing "Pick'em" contests as fantasy games of skill when they are in fact

15              sports wagers on operator-set betting lines.

16          b.   Marketing "Draft Style" contests as lawful fantasy drafts when they are in fact

17              pooled wagers on athlete performance;

18          c.   Representing that its services are legal and permitted in California when they

19              are not; and

20          d.   deceiving or confusing customers into believing that the gambling transactions

21              confer or involve certain rights, remedies, or obligations (i.e., the right to

22              recover winning and the obligation to pay for losses), when in fact any such

23              rights, remedies or obligations are prohibited by law.

24      134.    Defendant's conduct violated the following provisions of Cal. Civ. Code § 1770

25          a.   "Representing that goods or services have . . . characteristics . . . that they do

26              not have";

27          b.   "Using deceptive representations . . . in connection with . . . services"; and

28          c.   "Advertising goods or services with intent not to sell them as advertised."

135.    Defendant marketed "fantasy sports" while actually offering illegal sports-betting products.

136.    Defendant's conduct and actions are deceptive, untrue, and misleading to reasonable consumers, and will continue to mislead consumers in the future.

137.    Plaintiff and the Class relied on Defendant's advertisements, representations and/or omissions. Had they known the true nature of Underdog's contests, they would not have paid Defendant money or used the app.

138.    As a direct and proximate result of Defendant's misconduct, Plaintiff and California Class members have suffered and will continue to suffer actual damages.

139.    Defendant's wrongful conduct is ongoing and presents a continuing threat to Class members.

140.    Pursuant to § 1782(a) of the CLRA, Plaintiff's counsel has or will contemporaneously notify Defendant in writing by certified mail of the particular violations of §1770 of the CLRA and demanded that it rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to act. If Defendant fails to respond to Plaintiff's letter or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice, as proscribed by §1782, Plaintiff will move to amend his Complaint to pursue claims for actual, punitive and statutory damages, as appropriate against Defendant.  As to this cause of action, at this time, Plaintiff seeks only injunctive relief.

### THIRD CAUSE OF ACTION
**Restitution or Unjust Enrichment**
**(On behalf of Plaintiff Portugal and the Class)**

141.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–111 by reference as if fully set forth herein.

142.    Plaintiff and the other Class members conferred an economic benefit on Defendant through their in-game purchases.

143.    Under principles of equity and good conscience, it is inequitable and unjust for Defendant to retain the monies obtained from Plaintiff and the Class, which Defendant has unjustly obtained as result of its unlawful and deceptive practices in connection with Underdog and at the

expense of Plaintiff.

144.    As it stands, Defendant has retained millions of dollars in profits generated from Underdog and should not be permitted to retain those ill-gotten profits.

145.    Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1.  For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and his counsel as class counsel;

2.  Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3.  Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

4.  Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5.  Awarding pre- and post-judgment interest, as allowable by law;

6.  For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

7.  Declaratory and equitable relief, including restitution and disgorgement;

8.  For public injunctive relief as the Court may deem proper; and

9.  Awarding such further and other relief as the Court deems just, proper and equitable.

## **JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: August 26, 2025                    Respectfully submitted,


By: */s/ Scott Edelsberg*

**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq. (CA Bar No. 330990)
1925 Century Park E #1700

Los Angeles, CA 90067
Telephone: 305-975-3320
scott@edelsberglaw.com

**SHAMIS & GENTILE, P.A.**
Edwin Elliot*
14 NE 1st Ave., Suite 705
Miami, FL 33132
Telephone: 305-479-2299
Edwine@shamisgentile.com

*Pro Hac Vice forthcoming
*Counsel for Plaintiff and the Proposed Class*

*Counsel for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT